UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YALE M. FISHMAN 1998 INSURANCE
TRUST,

Plaintiff,

v.

PHILADELPHIA FINANCIAL LIFE
ASSURANCE COMPANY F/K/A AGL
LIFE ASSURANCE COMPANY, *et al.*,

Defendants.

11-cv-1283

**OPINION**

Plaintiff, the Yale M. Fishman 1998 Insurance Trust, brings this putative class action on behalf of itself and others who held certain insurance products sold by Philadelphia Financial Life Assurance Company f/k/a AGL Life Assurance Company ("PFLAC"). These insurance products lost value due to exposure to the Ponzi scheme perpetrated by Bernard Madoff. Against PFLAC, plaintiff brings claims of breach of fiduciary duty, common law fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of New York General Business Law ("GBL") § 349, gross negligence, negligent misrepresentation, unjust enrichment, and promissory estoppel.

1

Plaintiff also brings derivative claims against numerous corporate and individual defendants on behalf of certain funds in which its money was ultimately invested.

Defendants move to dismiss plaintiff's Consolidated Amended Direct and Verified Derivative Complaint (the "Complaint"). For the reasons detailed below, the motions to dismiss are granted.

## Background

Plaintiff purchased variable universal life insurance policies ("VULs") from PFLAC. One feature of a VUL is that policyholders are able to choose how their premiums are to be invested from among the various investment options offered by the issuer of the policy.

PFLAC provided plaintiff the option of investing its premiums with what is now known as the Tremont Opportunity Fund. The Tremont Opportunity Fund is itself a "fund of funds" that invested its assets with other Tremont-managed funds known as the Rye Select Funds. Tremont Partners served as General Partner of both the Tremont Opportunity Fund and each of the Rye Select Funds (the Tremont Opportunity Fund and the Rye Select Funds are collectively known as the "Nominal Defendants").

Assets managed by the Rye Select Funds were ultimately entrusted to Madoff. The fate of plaintiff's funds once in Madoff's hands is well known. Much of plaintiff's money was lost to Madoff's fraud.

2

Plaintiff also seeks to represent class members who purchased deferred variable annuities ("DVAs") from PFLAC, the assets of which were exposed and ultimately lost to Madoff's Ponzi scheme through a similar route.

Plaintiff alleges that PFLAC caused these losses by, in essence, failing to perform the promised—or in any event, a reasonable amount of—due diligence on the Tremont Opportunity Fund.

Plaintiff also brings derivative claims on behalf of the Nominal Defendants.  These derivative claims are brought against (1) the general partner of the Nominal Defendant funds, Tremont Partners; (2) Tremont Partners' corporate parent, Tremont Group Holdings, Inc. ("TGH"); and (3) a division of TGH, Rye Investment Management ("Rye") (Tremont Partners, TGH, and Rye are collectively known as the "Tremont Defendants").  Plaintiff also brings derivative claims against the corporate parents of TGH: Oppenheimer Acquisition Corp. ("Oppenheimer"), MassMutual Holding LLC ("MassMutual"), and Massachusetts Mutual Life Insurance Co. ("MMLI") (Oppenheimer, MassMutual, and MMLI are collectively known as the "Control Defendants"). Finally, plaintiff brings derivative claims against several individual directors and officers of Tremont Partners and TGH (the "Individual Defendants").

In its derivative claims, plaintiff argues that its losses would have been avoided had the Tremont Defendants not misled the Nominal Defendants about the steps being taken to safeguard their assets and had they managed the assets with a reasonable level of care.

### I.    The Parties

The named plaintiff is a trust holding VULs issued by PFLAC, the funds of which were invested in the Tremont Opportunity Fund.  It seeks relief both for itself and others who purchased either VULs or DVAs from PFLAC which lost value through exposure to Madoff's fraud.

Plaintiff brings direct claims against PFLAC, and derivative claims against the Tremont Defendants, Control Defendants, and Individual Defendants.

PFLAC is an insurance company organized under the laws of Pennsylvania.   It has its principal place of business in Philadelphia, Pennsylvania.

The Tremont Defendants consist of TGH, Tremont Partners, and Rye. TGH is an investment management firm organized under the laws of Delaware, with its principal place of business in Rye, New York.  It is the parent company of Tremont Partners and has also been known as Tremont Advisers, Inc., and Tremont Capital Management.  Tremont Partners is a wholly-owned subsidiary of TGH organized under the laws of Connecticut, with its principle place of business in Rye, New York.   Tremont Partners is the general partner and investment manager of the Nominal Defendants.  Rye is a division of TGH with its principal place of business in Rye, New York.  Rye managed the Rye Select Funds.

4

The Control Defendants—Oppenheimer, MassMutual, and MMLI—are the various corporate parents of the Tremont Defendants.  Oppenheimer is the direct corporate parent of TGH.  It is a Delaware corporation with its principal place of business in New York, New York.  MassMutual, in turn, is the corporate parent of Oppenheimer with its principal place of business in Springfield, Massachusetts.  Finally, MMLI is the corporate parent of MassMutual (and, therefore, the corporate great-grandparent of TGH) and also has its principal place of business in Springfield, Massachusetts.

Individual Defendants Sandra L. Manzke, Robert Schulman, Rupert A. Allan, Suzanne Hammond, Stephen Clayton, Mark Santero, and Timothy Birney are all former officers and directors of various Tremont Defendants.

The Nominal Defendants—the Tremont Opportunity Fund and the Rye Select Funds—are investment funds organized under the laws of Delaware.

## II.    Substantive Allegations

The Complaint details Madoff's fraud, the red flags that defendants allegedly could have detected but did not, the control relationships between defendants, and defendants' alleged financial incentive to turn a blind eye to the fraud.

Plaintiff alleges that PFLAC distributed to plaintiff various materials describing the Tremont Opportunity Fund.  In 2000, PFLAC provided a Private Placement Memorandum ("PPM") in connection with plaintiff's purchase of its VUL policies.  In a supplement to that PPM ("PPM Supplement"), the Tremont

5

Opportunity Fund was said to have the objective of providing above-average returns over a market cycle.  Certain risk factors associated with investing in the Tremont Opportunity Fund were also listed.  In 2008, PFLAC provided plaintiff a Second Amended and Restated PPM ("2008 PPM") that stated that Tremont Partners (as the general partner of the Tremont Opportunity Fund) would be able to obtain sufficient information about its investment managers to select them effectively, and reiterated the fund's investment goals as summarized in the PPM Supplement.

Plaintiff alleges that it was misled by these documents in numerous ways.  First, plaintiff's funds were not invested in accordance with the stated objectives of the Tremont Opportunity Fund—rather, plaintiff's funds were not invested at all.  Second, the risk factors included in the PPM Supplement did not include the possibility that plaintiff's funds would be lost in a Ponzi scheme.  Third, although the documents created the impression that PFLAC had vetted the Tremont Opportunity Fund by listing it as an investment option under its VUL policies, plaintiff alleges that PFLAC did none of the diligence that it represented it would do.

As for the Tremont Defendants, plaintiff alleges that they had a close relationship with Madoff, based largely upon a close personal relationship for much of the time period at issue between Madoff and Schulman (CEO of the Tremont Defendants).  However, despite this close relationship, and the Tremont Defendants' representations that they would closely monitor all of the

6

funds in which they invested, plaintiff alleges that they failed to notice numerous, conspicuous red flags. They failed to notice these red flags, plaintiff alleges, because they did not perform the due diligence the way they said they would. Plaintiff ascribes this lack of oversight to the Tremont Defendants' desire to continue collecting management fees from the ever growing pool of investment assets that they were attracting due to their affiliation with Madoff.

Finally, plaintiff argues that liability flows to the Control Defendants because of their control over the Tremont Defendants. Plaintiff alleges that Oppenheimer controlled the Tremont Defendants through its acquisition of TGH as well as through common directors and executives. Oppenheimer, in turn, was controlled by MassMutual and MMLI by virtue of their majority ownership of Oppenheimer and through common officers and directors.

## Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead sufficient facts to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In deciding such a motion, a court must accept as true the facts alleged in the complaint, but it should not assume the truth of its legal conclusions. *Iqbal*, 556 U.S. at 678–79. A court must also draw all reasonable inferences in the plaintiff's favor, and it may consider documents attached to the complaint, incorporated by reference into

the complaint, or known to and relied on by the plaintiff in bringing the suit. *ATSI Commc'ns, Inc. v. Shaar Fund. Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## Discussion

## I.    Derivative Claims

Plaintiff brings derivative claims on behalf of the Nominal Defendants against the Tremont Defendants, Control Defendants, and Individual Defendants.  For the reasons set forth below, the court holds that plaintiff does not have standing to assert its derivative claims, and, even if it did have standing, its derivative claims would be barred under the doctrine of *res judicata*.  As such, all derivative claims are dismissed.

### A.    Standing

Plaintiff and defendants dispute whether Delaware or New York law governs the question of whether plaintiff has standing to bring a derivative suit. Defendants argue that the Nominal Defendants are organized under the laws of Delaware and, thus, Delaware law should govern disputes involving their internal affairs.  Plaintiff argues that New York law should apply because New York has the stronger interest in the litigation.

Disputes involving an organization's internal affairs are typically governed by the laws of the state in which the entity was organized.  *Hausman v. Buckley*, 299 F.2d 696, 702 (2d Cir. 1962).  In fact, in New York, this internal affairs rule is written into statutory law.  *See* N.Y. P'Ship Law § 121-901; *see also Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 80 (S.D.N.Y.

2010), *aff'd sub nom. Saltz v. First Frontier, L.P.*, 485 F. App'x 461 (2d Cir. 2012) ("The question of standing to bring a derivative suit is governed by the law of the state of organization").   Thus, the court will apply Delaware law to the standing issue.

However, it is also worth noting that the parties' choice of law dispute lacks any practical importance because the same result obtains under New York and Delaware law.   So while the court applies Delaware law to the standing question, the outcome would be the same under the laws of New York.

Plaintiff fashions its claim as a double derivative suit.   Within the context of a limited partnership, a derivative claim allows a limited partner to sue on behalf of the general partner.   *See Litman v. Prudential-Bache Props., Inc.*, 611 A.2d 12, 15 (Del. Ch. 1992).   This mechanism allows the limited partner to force the general partner to live up to its fiduciary duty by suing a third party to enforce the general partner's rights for the benefit of the limited partners.

A double derivative suit is simply a vehicle for bringing a derivative suit across a second degree of separation.   Typically this takes the form of a suit brought by shareholders of a parent company to assert the rights of a subsidiary.   *See, e.g.*, *Lambrecht v. O'Neal*, 3 A.3d 277, 282 (Del. 2010).   A double derivative action is also possible in an analogous situation involving limited partnerships.   *See, e.g.*, *Flynn v. Bachow*, No. C.A. 15885, 1998 WL 671273 (Del. Ch. Sept. 18, 1998).   And, while there seems to be no exemplar in

9

Delaware law, there is no reason a double derivative suit could not be maintained across differing organizational structures, for example, when a limited partner seeks to sue on behalf of a corporation in which the general partner is a shareholder, or when a corporate shareholder seeks to sue on behalf of a partnership of which the corporation is a limited partner.

The last of these possibilities appears to be closest to the model suggested by plaintiff, which claims to stand in the shoes of PFLAC, a limited partner in the Tremont Opportunity Fund, in bringing a derivative suit on behalf of the fund.  But while such a suit is possible in theory, plaintiff lacks the requisite legal relationship with PFLAC to stand in its shoes.  A derivative plaintiff must be a *shareholder*, but plaintiff is merely a *policyholder*.[1]  *Yale M. Fishman 1998 Ins. Trust v. Gen. Am. Life Ins. Co.*, No. 11-cv-1284, 2013 WL 842642, at *5 (S.D.N.Y. Mar. 7, 2013).   Therefore plaintiff does not have standing to sue derivatively on behalf of the Nominal Defendants.  Plaintiff's derivative claims are dismissed.

---

[1] Plaintiff offers language from a 1944 Second Circuit opinion which suggests a conceptual generalization of the examples provided above: that a double derivative suit might be possible whenever a plaintiff seeks to force his fiduciary to compel that fiduciary's own fiduciary to act, thus suing on behalf of his fiduciary's fiduciary.  *Goldstein v. Groesbeck*, 142 F.2d 422, 425 (2d Cir. 1944).  Even if this were the law of Delaware today, it would not be of any help to plaintiff, which has not provided any facts to support the legal conclusion that PFLAC is its fiduciary.  On the contrary, the relationship is governed by a contract that explicitly provides that plaintiff has exclusive control over the assets invested through the policy.  *See infra* § II.C.

### B.     Res Judicata

Even if plaintiff did have standing to sue on behalf of the Nominal Defendants, its claims would be barred under the doctrine of *res judicata.*

"Under *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). To assert a defense of *res judicata* "a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000). However, literal privity between plaintiffs is not always required.  One whose interests were adequately represented by another vested with the authority of representation is bound by the judgment, even though he or she was not formally a party to the prior litigation.  *Alpert's Newspaper Delivery Inc. v. N.Y. Times Co.*, 876 F.2d 266, 270 (2d Cir. 1989).

Derivative suits present one such situation.  Because a derivative plaintiff stands in the shoes of a nominal defendant in asserting that nominal defendant's rights, judgments on the merits in derivative suits bar additional claims by that nominal defendant and, in turn, future derivative claims brought on that nominal defendant's behalf.  Judgments on the merits in suits brought directly by a party can also preclude future related derivative litigation

11

in which that party is named as the nominal defendant. *See Smith v. Alleghany Corp.*, 394 F.2d 381, 391 (2d Cir. 1968); *Greco v. Local.com Corp.*, 806 F. Supp. 2d 653, 658 (S.D.N.Y. 2011).

Because this principle creates the possibility that a later would-be plaintiff could be prejudiced by the actions of prior plaintiffs with potentially differing interests, notice must be given to other potential plaintiffs (typically other shareholders or members) before the entry of a stipulated judgment in a derivative suit. *See Papilsky v. Berndt*, 466 F.2d 251, 257–58 (2d Cir. 1972); Fed. R. Civ. P. 23.1. Similarly, in evaluating the preclusive effect of a prior judgment, courts verify the alignment of the earlier and later plaintiffs' interests, much as they do in initially evaluating the suitability of a derivative plaintiff. *See Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995).

In this case, plaintiff is hardly the first to bring derivative claims against the Tremont and Control Defendants on the Nominal Defendants' behalf. Similar or identical claims were asserted on plaintiff's behalf in the consolidated state law action which was disposed of on the merits by the Final Judgment and Order of Dismissal issued by this court on August 19, 2011.

Plaintiff does not contend that it did not receive notice of the settlement that produced that judgment, that the prior derivative plaintiffs did not adequately represent its interests, or that the prior derivative plaintiffs' interests were contrary to its own. Plaintiff also does not dispute that the prior

judgment was a judgment on the merits or that the claims it raises here could not have been raised then.   Rather, plaintiff argues only that it cannot be bound by the prior judgment because it was not a party to it.   But this is simply not the law as it relates to derivative actions.   Therefore, even if plaintiff did have standing to bring its derivative claims, the claims would be *res judicata*.  *See Gen. Am. Life Ins. Co.*, 2013 WL 842642, at *5–6.

As such, the derivative claims in this action are dismissed.

## II.   Direct Claims

Plaintiff alleges numerous direct claims against defendant PFLAC: breach of fiduciary duty, common law fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of N.Y. GBL § 349, gross negligence, negligent misrepresentation, unjust enrichment, and promissory estoppel.  Each of these direct claims is dismissed.

### A.   SLUSA

The Securities Litigation Uniform Standards Act ("SLUSA"), Pub. L. No. 105–353, § 101, 112 Stat. 3227 (1998) (codified at 15 U.S.C. §§ 77p(b), 78bb(f)(1)), bars certain state law based class actions alleging falsity "in connection with the purchase or sale of a covered security." *Id.*   Thus, the court must determine whether plaintiff's claims are precluded by SLUSA.

To fully understand SLUSA's scope, it is necessary to look at the history behind its passage.  *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78–83 (2006).

13

Following the stock market collapse in 1929 and the Great Depression, Congress enacted the Securities Act of 1933 and the Exchange Act of 1934 in order to protect investors and the overall financial system by deterring the propagation of false, misleading, or incomplete information in connection with the purchase or sale of certain securities. *See id.* at 78; *Anwar v. Fairfield Greenwich Ltd.*, 118 F. Supp. 3d 591, 600 (S.D.N.Y. 2015).

The Securities Act of 1933 includes a number of anti-falsity provisions. Section 11 imposes liability for registration statements "contain[ing] an untrue statement of a material fact or omitt[ing] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a) imposes liability for the offer or sale of a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." 15 U.S.C. § 77l(a)(2). Section 17(a) provides:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made . . . not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

14

15 U.S.C. § 77q(a).

The Exchange Act of 1934 significantly expanded the scope of federal securities regulation by establishing the Securities and Exchange Commission ("SEC") and through § 10(b).  Under § 10(b):

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  SEC Rule 10b–5, promulgated in 1942 pursuant to § 10(b), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Since at least 1946, courts have recognized an implied private right of action under Rule 10b-5.  *See Dabit*, 547 U.S. at 79.

In the decades that followed, large numbers of federal securities claims came to the courts.  And by the 1990s, Congress noticed that many of these federal securities class action lawsuits were problematic.  Plaintiffs were bringing meritless claims targeting deep-pocketed defendants in the hope of obtaining settlement.  *See id.* at 81.

In response, Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104–67, 109 Stat. 737 (codified in scattered sections of titles 15 and 18 of the U.S. Code).  PSLRA imposes heightened pleading requirements for federal securities fraud claims.

To avoid these heightened pleading requirements, putative class action plaintiffs increasingly sought to bring securities fraud claims under state law. *See Dabit*, 547 U.S. at 81–82.

Congress then enacted SLUSA to prevent plaintiffs from evading PSLRA's standards.  *See id.* at 82.  SLUSA has two separate preclusion provisions.  One amends the 1934 Act and uses terminology substantially modeled on § 10(b) and Rule 10b–5 in specifying the types of claims to which it applies.  It reads:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1).  The other preclusion provision amends the 1933 Act, using terminology substantially modeled on § 17(a).  It reads:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—(1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 77p(b).  Essentially, then, SLUSA precludes "covered class actions" alleging certain falsity "in connection with the purchase or sale of a covered security."  15 U.S.C. §§ 77p(b), 78bb(f)(1).

Turning to the case at hand, plaintiff does not contest that the action is a "covered class action" under SLUSA.  With regard to whether the alleged falsity was "in connection with the purchase or sale of a covered security," 15 U.S.C. § 78bb(f)(1), four recent precedential decisions shed light on this requirement: the Supreme Court's ruling in *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014), and the Second Circuit's rulings in *In re Herald*, 730 F.3d 112 (2d. Cir. 2013) ("*Herald I*"), *In re Herald*, 753 F.3d 110 (2d. Cir. 2014) ("*Herald II*"), and *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128 (2d Cir. 2015).

In *Troice*, the Supreme Court instructed that SLUSA covers claims of a "victim who took, tried to take, or maintained an ownership position in the statutorily relevant securities through 'purchases' or 'sales' induced by the fraud."  *See* 134 S. Ct. at 1067.  In *Herald II*, the Second Circuit confirmed that

17

the "in connection with" requirement covers conduct by intermediaries who induced victims to attempt to take ownership positions in covered securities, including through feeder funds, even where no such securities were ultimately purchased. *See* 753 F.3d at 113. And in *Kingate*, the Second Circuit reiterated the reasoning of *Herald II*, finding that SLUSA applied because the plaintiffs similarly expected that the feeder funds were investing proceeds in S&P 100 stocks, which are covered securities. *See Kingate*, 784 F.3d at 142.

These cases make clear that SLUSA's "in connection with the purchase or sale of a covered security" requirement is met here. Plaintiff alleges that it was harmed when, after being induced to invest in the Tremont Opportunity Fund, its money was paid into the Madoff Ponzi scheme instead of being invested in covered securities as it expected. That no covered securities were actually purchased is of no import. *See Herald II*, 753 F.3d at 113. What matters is that the plaintiff intended to invest in covered securities. Thus, the claims against PFLAC involve investments made in connection with covered securities.

However, not all of plaintiff's state law claims are necessarily precluded by SLUSA. Under *Kingate*, SLUSA only precludes "state law claims predicated on conduct *by the defendant* that is specified in SLUSA's operative provisions referencing the anti-falsity proscriptions of the 1933 and 1934 Acts." 784 F.3d at 146 (emphasis in original). *Kingate* instructs a two-part analysis:

18

> SLUSA requires courts first to inquire whether an allegation is of conduct by the defendant, or by a third party. Only conduct by the defendant is sufficient to preclude an otherwise covered class action. Second, SLUSA requires courts to inquire whether the allegation is necessary to or extraneous to liability under the state law claims. If the allegation is extraneous to the complaint's theory of liability, it cannot be the basis for SLUSA preclusion.

*Id.* at 142–43. This analysis must be done on a claim-by-claim basis. *Id.* at 143.

Using this approach, the Second Circuit divided claims into five groups:

> Group 1, which consists of claims predicated on a defendant's own fraudulent misrepresentations or misleading omissions;
>
> Group 2, which consists of claims predicated on a defendant's own negligent misrepresentations or misleading omissions;
>
> Group 3, which consists of claims predicated on a defendant's aiding and abetting (rather than directly engaging in) the frauds underlying the Group 1 claims;
>
> Group 4, which consists of claims predicated on a defendant's breach of contractual, fiduciary, or tort-based duties owed to plaintiff, resulting in failure to detect the frauds;
>
> Group 5, which consists of claims predicated on a defendant's receipt of unearned fees.

*Id.* at 134–35, 151–52. The Second Circuit concluded that claims in Groups 1, 2, and 3 are precluded under SLUSA but that claims in Groups 4 and 5 are not precluded.

Applying the approach to the claims at issue here, as explained in more detail below, the court finds that plaintiff's claims of common law fraud, violation of N.Y. GBL § 349, and negligent misrepresentation are precluded, but its claims of breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, gross negligence, unjust enrichment, and promissory estoppel are not precluded.

However, of the claims that survive SLUSA, the court must determine whether they must dismissed based on state law principles for failure to state a claim.  Accordingly, as explained below, plaintiff's claims of breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, gross negligence, unjust enrichment, and promissory estoppel are dismissed for failure to state a claim.

As such, each of plaintiff's direct claims is dismissed.

**B.     Choice of Law**

The court will apply New York law to plaintiff's tort claims.  Plaintiff pled on the basis of New York law and applied New York law in its brief.  *See* Pl.'s Omnibus Opp'n to Def.'s Mot.'s to Dismiss, ECF No. 50.  Defendant PFLAC assumed New York law applied to the tort claims for the purposes of its briefs as well.  *See* Mem. L. in Supp. PFLAC's Mot. to Dismiss 11 n.5, ECF No. 45; Reply in Supp. PFLAC's Mot. to Dismiss, ECF No. 56.

The parties' application of New York law to the tort claims makes sense given New York's choice of law rules.  A court sitting in diversity must look to

the choice of law rules of the forum state.  *IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).   Under New York law, courts need not undertake a choice of law analysis if there is no conflict between the applicable laws of the relevant jurisdictions.  *Id.*  If there is no conflict and New York substantive law is among the relevant choices, a court may apply New York substantive law. *Id.*  PFLAC notes that although the two insurance policies here were issued in Florida and Pennsylvania, the relevant laws of those jurisdictions are substantially the same as New York law.  *See* Mem. L. in Supp. PFLAC's Mot. to Dismiss 11 n.5, ECF No. 45.   The court will thus apply New York law to plaintiff's tort claims.

However, as to the contract claims, the court will apply Florida and Pennsylvania law.   The two policies purchased by plaintiff were issued in Florida and Pennsylvania, respectively, and those forums' laws apply according to the express terms of each policy.  *See* Decl. of Hutson Smelley, Ex. 2, ECF No. 46; Decl. of Hutson Smelley, Ex. 3, ECF No. 46.   "New York courts will generally enforce a clear and unambiguous choice-of-law clause contained in an agreement."  *Frankel v. Citicorp Ins. Servs., Inc.*, 80 A.D.3d 280, 285 (N.Y. App. Div. 2010) (citing *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500 (N.Y. 2006)).   Such enforcement extends to insurance policies.  *See Reger v. Nat'l Ass'n of Bedding Mfrs. Grp. Ins. Trust Fund*, 372 N.Y.S.2d 97, 115–16 (N.Y. Sup. Ct. 1975).   Thus, because of the choice of law clauses in

plaintiff's policies, the court will apply Florida and Pennsylvania law to plaintiff's contract claims.

The court now turns to each claim to determine whether the claim should be dismissed as precluded under SLUSA or for failure to state a claim.

### C.    Breach of Fiduciary Duty

Plaintiff's claim of breach of fiduciary duty is not precluded under SLUSA, but is dismissed because PFLAC did not owe a fiduciary duty to plaintiff.   Under New York law, a claim for breach of fiduciary duty requires (1) the existence of a fiduciary relationship; (2) misconduct by the defendant; and (3) damages directly caused by the defendant's misconduct.   *Varveris v. Zacharakos*, 110 A.D.3d 1059, 1059 (N.Y. App. Div. 2013).

This claim fits squarely within *Kingate*'s Group 4, and thus, is not precluded under SLUSA.   *Kingate*'s Group 4 consists of claims predicated on a defendant's breach of contractual, fiduciary, or tort-based duties owed to plaintiff, resulting in failure to detect the frauds.   Such claims are not precluded because they do not require false conduct by the defendant that violates the operative provisions of SLUSA.   Here, the false conduct at the heart of the controversy—the conduct that violated the operative provisions of SLUSA—was carried out by Madoff, not PFLAC.   Despite PFLAC's argument to the contrary, it is of no import that the language used by plaintiff to describe PFLAC's conduct mirrors that of SLUSA.   The question is whether, as an essential element of the claim, plaintiff must allege conduct by PFLAC that

violates the operative provisions of SLUSA.  It does not need to so allege.  Thus, the court finds that plaintiff's claim of breach of fiduciary duty is not precluded under SLUSA.

PFLAC argues that, even if the claim of breach of fiduciary duty is not precluded, it should still be dismissed because PFLAC, as an insurer, did not owe a fiduciary duty to plaintiff.  Generally, "the relationship between the parties to a contract of insurance is strictly contractual in nature," and thus, does not give rise to a fiduciary duty.  *Batas v. Prudential Ins. Co. of Am.*, 281 A.D.2d 260, 264 (N.Y. App. Div. 2001).   However, "[e]xceptional and particularized situations may arise in which insurance agents, through their conduct or by express or implied contract . . . may assume or acquire duties in addition to those fixed at common law."  *Murphy v. Kuhn*, 682 N.E.2d 972, 975 (N.Y. 1997).

Here, the VULs and DVAs allowed policyholders to choose how their premiums were invested from among the various investment options offered by PFLAC.  Plaintiff argues that this created a fiduciary duty that PFLAC owed to plaintiff because the policies contained both an insurance component and an investment component.

The circumstances here do not warrant a departure from the general rule that insurance contracts do not impose a fiduciary duty on the insurer.  *See 2002 Lawrence R. Buchalter Alaska Trust v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 232 (S.D.N.Y. 2015) (finding that defendant insurance company

owed no fiduciary duty to trust that purchased VULs); *SSR II, LLC v. John Hancock Life Ins. Co. (U.S.A.)*, 964 N.Y.S.2d 63 (N.Y. Sup. Ct. 2012).

In sum, while plaintiff's claim of breach of fiduciary duty is not precluded under SLUSA, the claim is dismissed because PFLAC did not owe a fiduciary duty to plaintiff.

### D.   Common Law Fraud

Plaintiff's claim of common law fraud is precluded under SLUSA. The claim falls within *Kingate* Group 1 because it requires proof that PFLAC made a fraudulent false statement or omission as an essential element.  Plaintiff does not dispute that, after *Kingate*, its claim of common law fraud should be dismissed as precluded under SLUSA.  Accordingly, plaintiff's claim of common law fraud is dismissed.

### E.   Breach of Contract

Plaintiff's claim of breach of contract is not precluded under SLUSA, but is dismissed on other grounds.  To establish a claim of breach of contract under Florida law, a plaintiff must prove the following elements: (1) a valid contract; (2) a material breach; and (3) damages.  *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. Dist. Ct. App. 1992)).  Under Pennsylvania law, the elements are essentially the same: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant

damages.  *Pennsy Supply, Inc. v. Am. Ash Recycling Corp. of Pa.*, 895 A.2d 595, 600 (Pa. Super. Ct. 2006).

This claim falls within *Kingate*'s Group 4, which, as previously noted, consists of claims predicated on a defendant's breach of contractual, fiduciary, or tort-based duties owed to plaintiff, resulting in failure to detect the frauds. Such claims are not precluded because they do not require false conduct by the defendant that violates the operative provisions of SLUSA. Therefore, plaintiff's claim of breach of contract is not precluded under SLUSA.

However, plaintiff has failed to allege a specific contract term that PFLAC breached.   Plaintiff accuses PFLAC of violating the contract formed by the policies, the PPMs, and other offering materials by failing to "perform due diligence" and "close the Tremont Opportunity Fund as an investment option." Compl. ¶ 185, ECF No. 15.  However, plaintiff does not point to—and the court cannot find—any provision in the policies, PPMs, or other offering materials that imposes either of those duties on PFLAC.  The court therefore dismisses plaintiff's claim of breach of contract for failure to state a claim.

### F.     Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff's claim of breach of the implied covenant of good faith and fair dealing is not precluded under SLUSA, but is dismissed on other grounds.

Plaintiff's claim of breach of the implied covenant of good faith and fair dealing falls into the non-precluded *Kingate* Group 4.  Therefore, the claim is not precluded under SLUSA.

However, the claim must still be dismissed. "Under Florida law, the implied covenant of good faith and fair dealing is a part of every contract." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999) (citing *Cty. of Brevard v. Miorelli Eng'g, Inc.*, 703 So.2d 1049, 1050 (Fla. 1997)). However, "an action for breach of the implied covenant of good faith cannot be maintained in the absence of breach of an express contract provision." *Burger King*, 169 F.3d at 1316 (citing *Hospital Corp. of Am. v. Fla. Med. Ctr.*, Inc., 710 So.2d 573, 575 (Fla. Dist. Ct. App. 1998)). As discussed above, plaintiff has not identified any contractual obligation breached by PFLAC. Thus, plaintiff does not have a claim for breach of the implied covenant of good faith and fair dealing for the policy issued in Florida.

With regard to the policy issued in Pennsylvania, "Pennsylvania law does not recognize a separate claim for breach of implied covenant of good faith and fair dealing." *Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc.*, 246 F. Supp. 2d 394, 400 (E.D. Pa. 2002). That is, "where the conduct forming the basis of the plaintiff's breach of duty of good faith and fair dealing claim is the same conduct forming the basis for the breach of contract claim, the claims merge and there is no separate cause of action for breach of duty of good faith and fair dealing." *Smith v. Lincoln Ben. Life Co.*, No. 08-01324, 2009 WL 789900, at *12 (W.D. Pa. Mar. 23, 2009), *aff'd*, 395 F. App'x 821 (3d Cir. 2010) (citing *Meyer v. Cuna Mut. Grp.*, 2007 WL 2907276, at *15 (W.D. Pa. Sept. 28, 2007)). Once again, it is important that plaintiff has not identified any

contractual obligation breached by PFLAC.  Plaintiff does not have a claim for breach of the implied covenant of good faith and fair dealing for the policy issued in Pennsylvania, and the claim is therefore dismissed.

### G.    Violation of N.Y. GBL § 349

Plaintiff's claim for violation of N.Y. GBL § 349 is precluded under SLUSA.   Section 349 of the New York General Business Law declares as unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  "A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000).  This claim falls within *Kingate* Group 1 or 2 because it requires proof that PFLAC made a fraudulent or negligent false statement or omission as an essential element. Plaintiff does not dispute that, after *Kingate*, its claim of violation of N.Y. GBL § 349 should be dismissed as precluded under SLUSA.  Accordingly, plaintiff's claim of violation of N.Y. GBL § 349 is dismissed.

### H.    Gross Negligence

Plaintiff's claim of gross negligence is not precluded under SLUSA, but is dismissed for failure to state a claim.  Under New York law, to state a claim for gross negligence, a plaintiff must allege the following elements: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; (3) injury

to the plaintiff as a result of the breach; and (4) conduct by defendant that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.  *Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356, 367–68 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 7 (2d Cir. 2009).

This claim falls within *Kingate*'s Group 4, and thus, is not precluded under SLUSA.  *See Anwar*, 118 F. Supp. 3d at 605, 617.

PFLAC makes two arguments as to why plaintiff's claim for gross negligence should be dismissed nevertheless.  PFLAC's first argument is that it did not owe a duty to plaintiff.  Plaintiff alleges that PFLAC owed plaintiff "a duty to manage and monitor the investments of [plaintiff] with reasonable care."  Compl. ¶ 199, ECF No. 15.  In very similar contexts, courts have come to differing conclusions as to whether such a duty might exist.  *Compare 2002 Lawrence R. Buchalter Alaska Trust*, 96 F. Supp. 3d at 222 (finding a "duty of care in vetting investment options" that "arises from circumstances extraneous to, and not constituting elements of, the contract"), *with Michael S. Rulle Family Dynasty Trust v. AGL Life Assur. Co.*, No. 10-231, 2010 WL 3522135, at *5 (E.D. Pa. Sept. 8, 2010), *aff'd*, 459 F. App'x 79 (3d Cir. 2011) (dismissing claim of negligence because no duty existed).

PFLAC's second argument is that damages are barred by the economic loss rule.  Under New York's economic loss rule or economic loss doctrine, a plaintiff cannot recover in tort for purely economic losses caused by a defendant's negligence.  *See Schiavone Const. Co. v. Elgood Mayo Corp.*, 436

28

N.E.2d 1322 (N.Y. 1982).   However, the economic loss rule does not apply in every tort action.   *See 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 750 N.E.2d 1097, 1101 n.1 (N.Y. 2001).   In determining whether to apply the economic loss rule, the New York Court of Appeals has instituted a "duty analysis" consisting of "policy-driven scrutiny of whether a defendant had a duty to protect a plaintiff against purely economic losses."   *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 302 (S.D.N.Y. 2012). "Plaintiffs who enter into transactions that are of a contractual nature—even if no contract exists—are limited to the benefits of their bargains unless they can show a legal duty separate and apart from obligations bargained for and subsumed within the transaction."   *In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 185 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).   Accordingly, if the court finds that PFLAC did indeed owe an independent duty of care to plaintiff outside of the contract, the economic loss rule would not preclude plaintiff's claim of gross negligence.   PFLAC's two arguments thus boil down to a single argument: that it did not owe plaintiff any duty.

Ultimately, the court need not decide whether PFLAC owed plaintiff a duty, because plaintiff fails to sufficiently allege the fourth element necessary to state a claim for gross negligence—that is, conduct by defendant that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.   PFLAC was careful to warn investors that they bore the risk of the

investment.   For example, the PPM Supplement prominently stated: "THE POLICYHOLDER BEARS THE ENTIRE INVESTMENT RISK FOR ALL AMOUNTS INVESTED IN THE POLICY, INCLUDING THE RISK OF LOSS OF PRINCIPAL." Decl. of Hutson Smelley, Ex. 4, ECF No. 46.   That same PPM Supplement further warned investors that Tremont Fund's general partner would have complete discretion over the selection of managers and that a thorough investigation of potential managers might not be possible because of limited publicly available information.   *Id.*   These sorts of warnings—and the fact that investors knew that Tremont was responsible for choosing a manager—belie the claim that PFLAC's conduct evinced a reckless disregard for the rights of others or smacked of intentional wrongdoing.   Simply put, a claim of gross negligence is not plausible on the facts alleged by plaintiff and must be dismissed.

## I.   Negligent Misrepresentation

Plaintiff's claim of negligent misrepresentation is precluded under SLUSA.   Under New York law, the elements of a negligent misrepresentation claim are: (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.   *Hydro Inv'rs, Inc. v.*

*Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).  This claim falls within *Kingate* Group 2, which consists of claims predicated on a defendant's own negligent misrepresentations or misleading omissions.  Thus, because the claim requires false conduct by PFLAC that violates the operative provisions of SLUSA, the claim should be dismissed.  Unsurprisingly, then, plaintiff does not dispute that, after *Kingate*, its claim of negligent representation should be dismissed as precluded under SLUSA.  Accordingly, plaintiff's claim of negligent misrepresentation is dismissed.

> **J.    Unjust Enrichment**

Plaintiff's claim of unjust enrichment is not precluded under SLUSA but is dismissed for failure to state a claim.  Both plaintiff and defendant PFLAC apply New York law to the claim of unjust enrichment, and the court will follow suit.  Under New York law, to state a claim of unjust enrichment, a plaintiff must establish three elements: (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution. *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006).

Plaintiff's claim of unjust enrichment falls within *Kingate* Group 5, which consists of claims predicated on a defendant's receipt of unearned fees.  Such claims are not precluded because they do not require false conduct by the defendant that violates the operative provisions of SLUSA.  Therefore, plaintiff's claim of unjust enrichment is not precluded under SLUSA.

However, plaintiff's claim of unjust enrichment must still be dismissed. "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005). Accordingly, the "existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987). Here, plaintiff's claim asserts rights that are governed by the policies, namely, that PFLAC "collected improper management fees based on the Policies' net asset values." Compl. ¶ 209, ECF No. 15. Thus, because the collection of fees was governed by the policies, plaintiff cannot maintain its claim for unjust enrichment.

Plaintiff argues that, because it pleads its claim for unjust enrichment in the alternative to the breach of contract claim, dismissal is improper. However, a claim for unjust enrichment may only survive as an alternative theory of liability when the existence of the contract is in dispute. *See New Paradigm Software Corp. v. New Era of Networks, Inc.*, 107 F. Supp. 2d 325, 329 (S.D.N.Y. 2000). Here, there is no dispute that the policies formed a valid and enforceable contract between plaintiff and PFLAC. Thus, plaintiff's unjust enrichment claim is dismissed.

32

### K.     Promissory Estoppel

Plaintiff's claim of promissory estoppel is not precluded under SLUSA, but is dismissed for failure to state a claim.   Under New York law, a party seeking to state a claim for promissory estoppel must allege that (1) a speaker made a clear and unambiguous promise; (2) it was reasonable and foreseeable for the party to whom the promise was made to rely upon the promise; and (3) the person to whom the promise was made relied on the promise to his or her detriment.   *Johnson & Johnson v. Am. Nat. Red Cross*, 528 F. Supp. 2d 462, 463 (S.D.N.Y. 2008).   This claim most likely falls within *Kingate* Group 4, but regardless, it is not precluded because it does not rely on false conduct by PFLAC that violates the operative provisions of SLUSA.   Therefore, plaintiff's claim of promissory estoppel is not precluded under SLUSA.

However, plaintiff still fails to state a claim for promissory estoppel. Plaintiff alleges that PFLAC "made a clear and unambiguous promise in the documents and materials tendered to Plaintiff and the Class to conduct and perform due diligence and the continued monitoring of the fund managers." Compl. ¶ 215, ECF No. 15.   But, as discussed above, plaintiff has not pointed to any provision in the policies or other materials in which PFLAC makes any such promise.   In fact, the PPM Supplement prominently stated: "THE POLICYHOLDER BEARS THE ENTIRE INVESTMENT RISK FOR ALL AMOUNTS INVESTED IN THE POLICY, INCLUDING THE RISK OF LOSS OF PRINCIPAL." Decl. of Hutson Smelley, Ex. 4, ECF No. 46.   Because plaintiff fails to allege

sufficiently that PFLAC made a clear and unambiguous promise, plaintiff's claim of promissory estoppel is dismissed.

In sum, each of plaintiff's direct claims must be dismissed as either precluded under SLUSA or because they fail to state a valid claim.

### Conclusion

Defendants' motions to dismiss are granted in their entirety. This resolves all outstanding motions on the docket 11-cv-1283. The Clerk of Court is directed to close the case.


SO ORDERED.

Dated: New York, New York
      May 3, 2016

Thomas P. Griesa
U.S. District Judge